The State, ex rel. Hyter, Appellant, *v.* Teater, Director, et al., Appellees.

(No. L-76-229—Decided February 4, 1977.)

*Messrs. Wilkowski & Bloom,* for appellant.
*Mr. William J. Brown,* attorney general, *Messrs. Spengler, Nathanson, Heyman, McCarthy & Durfee,* and *Mr. James R. Jeffery,* for appellees Robert Teater et al.
*Messrs. Doyle, Lewis & Warner* and *Mr. Richard F. Ellenberger,* for appellees Raymond Rona et al.

Potter, J. This case involves the establishment of an open season for the hunting of mourning doves. The issue of whether there should be an open season for mourning doves has evoked a considerable emotional conflict between those who view the mourning dove. as a song bird whose plaintive refrain strikes a responsive note in the listener and those who view the dove as an object of sport with the dove having the advantage. However, as the trial court noted, the question of whether there should or should not be a season for hunting mourning doves is not a question before this court. The primary question is whether the legislature delegated to the chief of the division of wildlife, of the Department of Natural Resources of Ohio, authority to establish a season for the hunting of mourning

doves in Ohio.[1] When the trial judge denied a temporary restraining order, he found that the proper procedure was followed to establish such a season. That finding is not challenged on appeal.

Plaintiffs' prayer to permanently enjoin the hunting, shooting and killing of the mourning dove and for such other and further relief to which the plaintiff might be entitled under law and equity was denied. The trial court held as follows:

"Upon consideration of the facts, the briefs of coun-

[1] By way of comparison, we note that in seventeen states (Alabama, Alaska, California, Colorado, Georgia, Idaho, Massachusetts, Nevada, North Carolina, Pennsylvania, Rhode Island, Tennessee, Texas, Virginia, Washington, West Virginia, Wyoming), the state fish and game commission or its equivalent may, by promulgating rules and regulations, designate and classify wildlife species as game or nongame. In other states, the statutory language is ambiguous, but it appears that in twenty-one states (Arizona, Arkansas, Florida, Hawaii, Kansas, Illinois, Indiana, Iowa, Kentucky, Maine, Michigan, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, North Dakota, Oklahoma, South Carolina, Utah, Wisconsin) the fish and game commission has only enumerated administrative, regulatory, or enforcement powers, which do not include the power to designate game and nongame species. In some of these states, however, there are endangered species acts which authorize either the commission or a separate environmental agency to designate nongame and/or endangered species, and subsequently to modify the list by addition or deletion. In an additional eleven states (Connecticut, Delaware, Louisiana, Maryland, Minnesota, Mississippi, Missouri, New York, Oregon, South Dakota, Vermont), the commission is given broad general powers, but not specifically the power to designate. For these states it is not possible to determine the scope of the commission's power from the statutory language alone.

Further, doves generally or mourning doves specifically are listed as game birds or migratory game birds in 25 states (Arizona, California, Colorado, Delaware, Florida, Illinois, Indiana, Iowa, Louisiana, Maryland, Mississippi, Nevada, New Hampshire, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Virginia, West Virginia). They are protected by reason of omission from the list of statutory game birds in fourteen states (Arkansas, Connecticut, Hawaii, Kentucky, Maine, Michigan, Montana, Nebraska, New Jersey, New York, North Dakota, Wisconsin, Wyoming). They are specified by name as protected in three states (Idaho, Kansas, Minnesota). Seven states do not list game species by name (Alabama, Alaska, Georgia, Massachusetts, Missouri, Vermont, Washington).

sel and the law applicable to this case, the court finds that the division of wildlife of the Ohio Department of Natural Resources has broad rule making power and authority under current statutory framework. The division of wildlife has been delegated power and authority to set an open season for non-game birds. Under the provisions of ORC 1531.81 (*sic*), the chief of the division has the power to establish a season (*sic*) any wild animals provided however, he first secures approval of the wildlife council as provided for under ORC 1533.07. In this case, such approval was properly obtained.''

From this judgment, the plaintiff appeals and assigns the following error:

''The trial court erred in ruling that (a) the legislature delegated power and authority to set seasons for non-game birds (b) that the chief of the division has authority to regulate the taking and possession of mourning doves (c) that the chief and the wildlife council have ousted the legislature from its historical authority to distinguish between game and non-game animals.''

We find the above assignment of error in part well taken, reverse the trial court and grant the injunction prayed for.

It is asserted that this is a case of first impression. The wildlife division established the mourning dove season by erroneously extending the effect of the language found in the amendment to R. C. 1531.08, effective January 1, 1974. This section in pertinent part reads as follows:

''The chief [of the division of wildlife] may regulate:

''(A) Taking and possessing wild animals, at any time and place or in any number, quantity, or length, and in any manner, and with such devices as he prescribes * * *.''

The above section was a part of an act amending many sections of R. C. Chapter 1531 and Chapter 1533 and was captioned: "An Act to protect endangered species of wildlife." This case involves statutory construction and in construing the statute we must apply the recognized rules of construction. One of the rules for statutory construction is as follows:

"* * * [I]f on the face of a statute there is doubt as to its meaning, and the doubt can be removed and the intent gathered by reference to cognate provisions, it is the duty of the courts to use them in aid of construction to learn and carry out the legislative intent. Thus, a particular statute or section should be construed in the light of, with reference to, or in connection with other statutes and sections, especially where the provisions, though separated in the Code were formerly part of but one section of an act or of the same act. It follows that all such sections and statutes are to be considered and compared with reference to the entire system of which all are parts. A code of statutes relating to one subject is presumed to be governed by one spirit and policy, and intended to be consistent and harmonious, and all of the several sections are to be considered in order to arrive at the meaning of any part, unless a contrary intent is clearly manifest." See 50 Ohio Jurisprudence 2d 197, Statutes, Section 221.

A review of R. C. Chapter 1531, entitled Division of Wildlife, and R. C. Chapter 1533, entitled Hunting and Fishing, reveals too many contradictory and inconsistent sections to permit the holding that the legislature intended to delegate to the chief of the division of wildlife authority to establish a new species for hunting.

R. C. 1531.08 formerly read as follows:

"The council [of the division of wildlife] may regulate: (A) Taking and possessing clams or mussels, crayfish, aquatic insects, fish, frogs, turtles, and game, at any time and place or in any number, quantity, or length, and in any manner, and with such devices as he prescribes * * *."

It may reasonably be argued that the legislature was substituting the generic words, "wild animals" for the prior listing of specific species.

In comparison with other sections of the chapters, we find that R. C. 1533.02 contains detailed provisions relative to open seasons and bag limits for game birds, fish and fur-bearing animals. R. C. 1531.01(S) defines game birds as follows:

" 'Game birds' includes pheasants, quail, ruffed grouse,

sharp-tailed grouse, pinnated grouse, wild turkey, Hungarian partridge, Chukar partridge, woodcocks, black-breasted plover, golden plover, Wilson's snipe or jack-snipe, greater and lesser yellowlegs, rail, coots, gallinules, duck, geese, and brant."

R. C. 1531.01(T), defines nongame birds as follows:

" 'Nongame birds' includes all other wild birds not included and defined as game birds."

Webster's Third New International Dictionary (1971) defines "game bird" as "a bird made legitimate quarry for hunters by state or other law." See also 38 Corpus Juris Secundum 2, Game, Section 1. In effect, the order of the chief established the mourning dove as a game bird. This is a usurpation of legislative authority, since game and nongame birds have been clearly defined in R. C. 1531.-01.

Further, in construing R. C. 1531.08, it is also necessary to consider a code section that antedates it, R. C. 1533.07, which reads in pertinent part as follows:

"Protection afforded nongame birds.

"No person shall catch, kill, injure, pursue, or have in his possession, either dead or alive, or purchase, expose for sale, transport, or ship to a point within or without the state, or receive or deliver for transportation any bird other than a game bird, or have in his possession any part of the plumage, skin, or body of any bird other than a game bird, except as permitted in Chapters 1531. and 1533. of the Revised Code, or disturb or destroy the eggs, nest, or young of such a bird."

This section is analogous to the former G. C. 1409, which read as follows:

"No person shall catch, kill, injure, pursue, or have in his possession either dead or alive, or purchase, expose for sale, transport or ship to a point within or without the state a turtle dove or *mourning dove,* sparrow, nut-hatch, warbler, flicker, vireo, wren, American robin, catbird, tanager, bobolink, bluejay, oriole, grosbeck or redbird, creeper, redstart, waxwing, woodpecker, humming bird, killdeer, swallow, bluebird, blackbird, meadowlark, bunt-

ing, starling, redwing, purple martin, brown thresher, American goldfinch, chewink, or ground robin, pewee or phoebe bird, chickadee, fly-catcher, gnat catcher, mouse-hawk, whippoorwill, snowbird, titmouse, gull, eagle, buzzard, *or any wild bird other than a game bird.* No part of the plumage, skin or body of such birds shall be sold or had in possession for sale." (Emphasis added.)

To hold that the recent amendment to R. C. 1531.08 modifies R. C. 1533.07, under which mourning doves have until now been protected since they are not game birds, and numerous other sections of the code, for example R. C. 1533.191 in regard to the purchase of game birds for dog training,[2] is to extend the implication of R. C. 1531.08 beyond its scope. If the legislature had intended as a modern concept, to delegate the authority to name species for hunting, in contradiction to its historical practice of doing so by legislative action, it easily could have done so. For example, in 1957, R. C. 1531.01(S) was amended to include the wild turkey as a game bird. As to the early controversy relative to quail, see 1925 Ohio Atty. Gen. Ops. 775, No. 3032. Further, such a distinct break from the historical precedent established by the legislature would not have occurred in a relatively minor amendment to a single paragraph in an existing section. Such a break from historical precedent would have been in clear and unmistakable language. If the legislature desires such a change it may still so speak. See R. C. 1531.02, wherein the legislature has previously declared that the ownership of and the legal title to all wild animals is in the state and the state holds such title in trust for the benefit of all the people.

---

[2] R. C. 1533.191 reads in pertinent part:

"Organized field trial clubs or individuals may purchase domestically raised quails, chukar partridges, pheasants, black and mallard ducks, and other game birds from licensed breeders, and may shoot quails, chukar partridges, pheasants, ducks, or other game birds and common pigeons that are approved by the division of wildlife at any time during the daylight hours, only on grounds designated by the division of wildlife as 'dog training grounds,' and only as provided in this section and under such additional regulations as the chief of the division of wildlife may prescribe * * *."

We further find after an examination of R. C. 1531.06[8] that it was not the present intent of the legislature to break from its historical precedent of regulating the taking and possession of wild animals on state owned lands and waters. The wildlife division never used R. C. 1531.06 as authority to establish an open season for the hunting of nongame birds on state lands. Whereas R. C. 1531.06 is restricted to lands and waters owned and controlled by the state, R. C. 1531.08 has a broader scope. However, the intent of both sections is to protect and restrict the taking of species.

*State* v. *Switzer* (1970), 22 Ohio St. 2d 47, while holding that R. C. 1531.08 was not an unlawful delegation of legislative power, did not interpret the statute as providing that the chief of the division of wildlife could establish an open season for a new species, but rather as reflecting the legislature's intent that wild animals are worthy of state regulation and that their protection and preservation merits and requires constant supervision by persons qualified to implement that purpose. In referring to *State, ex rel. Sofeico,* v. *Heffernan* (1937), 41 N. M. 219, 67 P. 2d 240, reference is made to such changing factors as drought, flood, etc., which, coupled with an open season, might exterminate these species. The thrust of the *Switzer* decision was to permit reasonable regulations under delegated authority that would extend protection to wildlife, not reduce it.

For the foregoing reasons, we find that the chief of the division of wildlife did not have authority to declare an open season for the mourning dove and to this extent the appellant's assignment of error is well taken.

---

[8]"The chief may make and issue orders benefiting wild animals, fish or game management, preservation, propagation, and protection, outdoor and nature activities, public fishing and hunting grounds, flora and fauna preservation, and regulating the taking and possession of wild animals on any lands or waters owned or leased or under division supervision and control, and may for a specified period of years prohibit or recall the taking and possession of any wild animal on any portion of such lands or waters. The division shall clearly define and mark the boundaries of the lands and waters upon which the taking of any wild animals is prohibited."

The judgment of the Court of Common Pleas of Lucas County is reversed and in rendering the judgment the trial court should have rendered, we order, adjudge and decree that in the state of Ohio all persons are permanently enjoined from the hunting, shooting and killing of the mourning dove.

*Judgment reversed.*

BROWN, P. J., and WILEY, J., concur.

WILEY, J., retired, was assigned to active duty under authority of Section 6(C), Article IV, Constitution.

BROWN, P. J., concurring. I would rest my conclusion that the chief of the wildlife division cannot establish a hunting season for mourning doves on two factors.

1. Mourning doves are not "game birds" within the definition of game birds as statutorily defined in R. C. 1531.01(S). That mourning doves are nongame birds is reinforced by R. C. 1531.01(T), which reads:

"'Nongame birds' includes all other wild birds not included and defined as game birds."

2. The Ohio General Assembly by a specific and unambiguous statute, R. C. 1533.07, set forth verbatim in the opinion of Judge Potter, has prohibited any person to "catch, kill, * * * or have in his possession * * * any bird other than a game bird * * *."

R. C. 1533.07, by reason of clear prohibitory language forbidding the taking or possession of nongame birds, which includes mourning doves, means that the chief of the wildlife division and the wildlife division cannot, by establishing a hunting season for mourning doves, permit what the legislature prohibits.

The defendants argue that although R. C. 1533.07 prohibits hunting and taking nongame birds, the division of wildlife has the power to permit and to regulate such hunting and taking of nongame birds by virtue of the phrase "except as permitted in Chapters 1531. and 1533. of the Revised Code," contained in R. C. 1533.07. Defendants argue that this exception refers to the power of the division of wildlife to establish hunting seasons for all

wild animals, which include nongame birds (see R. C. 1531.-01 [Q] and [X]); the powers of the chief of the division of wildlife to control and to regulate the preservation, taking and possessing of wild animals as provided in R. C. 1531.08, particularly paragraph (A) thereof; and the chief's order, Chapter NRw-7, Rule 05, pertaining to a hunting season for mourning doves which was declared pursuant to R. C. 1531.08.

The interpretation of R. C. 1533.07 urged by defendants could well result in the wildlife division's permitting the hunting and killing of all nongame birds, the direct opposite of the object sought by the legislature by the enactment of R. C. 1533.07, which was the protection of nongame birds. This interpretation urged by defendants is equivalent to saying that the chief of the wildlife division can completely nullify a state statute, R. C. 1533.07. Such a result is contrary to elementary principles of statutory construction. To interpret a law so as to make it wholly nugatory is the last extremity to which judicial construction should go. An interpretation should, if possible, be avoided under which the statute is nullified or made useless, inoperative, or without effect or significance. 50 Ohio Jurisprudence 2d, Statutes, Sections 226, 229 and 230.

An interpretation urged by defendants that the chief of the wildlife division may establish, under R. C. Chapter 1531, a hunting season for mourning doves resulting in their destruction is a misapplication of the *pari materia* rule. It is a fundamental rule of statutory construction that sections and acts in *pari materia*—that is, in relation to the same matter or object—should be construed together. 50 Ohio Jurisprudence 2d 189, Statutes, Section 216. The *pari materia* rule is not to be applied to effect a statutory construction contrary to the clearly manifested intent of the legislature. 50 Ohio Jurisprudence 2d 196, Statutes, Section 220. The interpretation of R. C. 1533.07 urged by defendants is clearly contrary to the manifest intent of the legislature—*i. e.*, "protection afforded nongame birds," as stated in its heading or title.

Relevant thereto it should be observed that R. C. Chap-

ter 1533 is titled, Hunting; Fishing, and concerns primarily what hunters and fishermen are permitted to do or are prohibited from doing. An entirely different purpose is served by R. C. Chapter 1531, titled Division of Wildlife, which concerns itself primarily with the functions, duties and powers of the division of wildlife and its chief. The object and purpose of each chapter is different. 50 Ohio Jurisprudence 2d, Statutes, Sections 247, 253, 255 and 263.

An interpretation of R. C. 1533.07, concerned with "Protection afforded nongame birds," that would empower the chief of the wildlife division under R. C. Chapter 1531 to permit the entire destruction of all nongame birds is absurd and not a reasonable construction of the statute. It is a fundamental rule that the legislature intends to enact legislation which is reasonable and there is a presumption against absurdity in the enactment of the statute. 50 Ohio Jurisprudence 2d 221, Statutes, Section 238.

The title or heading of R. C. 1533.07 is "Protection afforded nongame birds." The title or heading of a statute is an aid and factor in correctly interpreting a statute, and should be utilized in determining its purpose and interpretation. 50 Ohio Jurisprudence 2d 243, 244, Statutes, Sections 259, 260.

R. C. 1533.07, with the heading "Protection afforded nongame birds," sets forth a specific purpose and is a specific statute, that is, a statute passed for a particular purpose as distinguished from a general purpose, and covering a particular subject matter. *Cincinnati* v. *Bossert Machine Co.* (1968), 16 Ohio St. 2d 76, *certiorari denied* 394 U. S. 998; *Leach* v. *Collins* (1931), 123 Ohio St. 530; 50 Ohio Jurisprudence 2d 20, Statutes, Section 10. By contrast, R. C. 1531.01, 1531.02, and 1531.08 are statutes of a general purpose covering other subjects in general terms in addition to the subject matter covered by R. C. 1533.07. *Cincinnati* v. *Bossert Machine Co.*, *supra; State, ex rel. Steller,* v. *Zangerle* (1919), 100 Ohio St. 414. A specific statute (R. C. 1533.07) will prevail over the provisions of general statutes. (R. C. 1531.01, R. C. 1531.02, and R. C. 1531.08) *Cincinnati* v. *Bossert Machine Co.*, *supra*; 50 Ohio Jurisprudence 2d 83, Statutes, Sections 104-107.

Consistent with the foregoing elementary principles of statutory construction, the phrase "except as permitted in Chapters 1531. and 1533. of the Revised Code," in R. C. 1533.07, refers only to statutes in those two chapters which specifically enumerate certain nongame birds as being exempt from the provisions of R. C. 1533.07, and does not encompass general or specific powers granted by the legislature to the division of wildlife or its chief, such as powers to prescribe hunting seasons for wild animals.

Ordinarily, a strict or narrow construction is applied to a statutory exception to the operation of a general law. Courts favor a general provision over an exception. *Dalehite v. United States* (1953), 346 U. S. 15; 73 American Jurisprudence 2d 463, Statutes, Section 313. An exception to a statute will be construed so as to avoid nullifying or restricting its apparent principal purpose and the positive provisions made to carry it out. As between an exception to a statute and its provisions, the language of which is mandatory, the provisions will control. *Interstate Natural Gas Co.* v. *Federal Power Comm.* (C. A. 5, 1946), 156 F. 2d 949, *affirmed* 331 U. S. 682; *Commonwealth Loan Co.* v. *Berry* (1965), 2 Ohio St. 2d 169; *Andrianos* v. *Community Traction Co.* (1951), 155 Ohio St. 47; *Acme Engineering Co.* v. *Jones* (1948), 150 Ohio St. 423; 82 Corpus Juris Secundum 831, 889, Statutes, Sections 367 and 382.

A reasonable interpretation of the "exception" phrase in R. C. 1533.07 is that it does not modify the entire first paragraph but only the clause which precedes it—namely, "or have in his possession any part of the plumage, skin, or body of any bird other than a game bird."

The Ohio General Assembly derives its legislative power from Section 1 of Article II of the Ohio Constitution, and its specific power to enact laws conserving natural resources, such as birds and wild animals, from Section 36, Article II, Conservation of Natural Resources. This legislative power of the Ohio General Assembly, by reason of the constitutional grant to it, is superior to and controls the administrative power of the wildlife division and its chief. The wildlife division officials have only such powers as are granted to them by statutes enacted by the legislature.